1   CRAIG H. MISSAKIAN (CABN 125202)
    United States Attorney
2
    MARTHA BOERSCH (CABN 126569)
3   Chief, Criminal Division

4   JONATHAN U. LEE (CABN 148792)
    Assistant United States Attorney
5
        1301 Clay Street, Suite 340S
6       Oakland, California 94612
        Telephone: (510) 637-3680
7       FAX: (510) 637-3724
        Jonathan.Lee@usdoj.gov
8
    Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     Plaintiff, <br>   v. <br> STACCATO POWELL, <br>     Defendant. | CASE NO. CR 22-0003 JSW <br><br> **SENTENCING MEMORANDUM OF THE UNITED STATES** <br><br> Date: September 23, 2025 <br> Time: 1:00 p.m. <br> Before: Hon. Jeffrey S. White |

## I. INTRODUCTION

Staccato Powell comes before this Court for pronouncement of sentence following his guilty plea on charges of conspiracy, wire fraud, and mail fraud. He committed these crimes while holding powerful office in the AME Zion Church. As bishop, Powell held a position of trust and responsibility for a large geographical area of the denomination, from Alaska to Arizona and from Colorado to California. The fraud scheme at the heart of this case involved Powell's transfer of title from local congregations to his separately controlled corporate entity, the Western Episcopal District, Incorporated, an entity that did not exist until Powell created it. Powell used false statements in church resolutions to effectuate the title transfer to his separate corporate entity, and then he used the church properties as collateral for loans that provided funds to his separate corporate entity. Powell did this without the approval of the congregations. Powell later sought bankruptcy protection for his separate corporate entity. As a result, the congregations Powell once led as bishop now face possible loss of their churches through foreclosure or other bankruptcy relief.

The United States requests that the Court impose the sentence outlined in the parties' binding plea agreement. This would include a term of imprisonment of time served followed by a three-year term of supervised release, with the first 18 months to be served on home confinement, and restitution in the amount of $12,475,453. The requested sentence provides finality and certainty, avoiding any risk of an adverse outcome and extended trial and any appellate proceedings. It also punishes Powell by confirming his status as a felon and restricting his liberty. The requested sentence also advances the timeline for the final, known outcome, confirming this month that the underlying transactions were fraudulent. Finally, the parties' agreed sentence locks in a significant restitution obligation of at least $3 million, with the government able to argue for the greater amount stated above. For all of the reasons discussed in this memorandum, the government requests that the Court impose this sentence.

## II. PROCEDURAL HISTORY

On January 6, 2022, the Grand Jury returned the Indictment charging Powell and co-defendant Quintana. Dkt. 1. On April 22, 2025, Defendant Quintana pleaded guilty. Dkt. 181. On July 15, 2025, Defendant Powell pleaded guilty. Dkt. 195. Powell pleaded guilty to the four charges in the Indictment: Conspiracy to Commit Mail/Wire Fraud in violation of 18 U.S.C. § 1349 (Count One), Wire Fraud in

violation of 18 U.S.C. § 1343 (Counts Two and Three), and Mail Fraud in violation of 18 U.S.C. § 1341 (Count Four).

## III. FACTUAL BACKGROUND

### A. The AME Zion Church

The African Methodist Episcopal Zion Church ("AME Zion" or "Denomination") is a historically African American Christian denomination with over 1.4 million members. Americans have worshipped in AME Zion churches since the early 1800s. Before they were legally accorded citizenship under the Constitution and before the formal formation of the first AME Zion congregation in New York City, parishioners sought spiritual safe harbor in the AME Zion Church throughout the eastern United States. New AME Zion churches started across the west, from Arizona to Alaska and Colorado to California, in the latter half of the 1800s, joining early western congregations such as the First AME Zion Church of San Francisco, founded in 1852, and the First AME Zion Church of San Jose, a fixture in San Jose since its founding in 1864.

The AME Zion's General Conference is the supreme administrative body of the church; however, between meetings of the conference, the highest authority for the church is the Board of Bishops. AME Zion is organized into twelve geographic districts, with each having a bishop serving a four-year term as the presiding prelate of their region. One of the twelve geographic districts in AME Zion overseen by a bishop is entitled the Western Episcopal District. Currently, according to the Denomination, the Western Episcopal District consists of approximately 40 churches and 1,600 members of congregations located in California, Alaska, Arizona, Colorado, Oregon, and Washington.

### B. Background on AME Zion's Polity and Rules, including the *Book of Discipline*

In its *Book of Discipline,* AME Zion codifies the laws and polity by which the Church governs itself. The Book of Discipline requires a four-prong test prior to any sale or other encumbrance of church property, including the consent of the congregation in a majority vote at a meeting:

> 1. A meeting must be held by the Board of Trustees of the local church to consider either a transfer or obtaining a mortgage on the respective church's property;
>
> 2. The consent of the majority of the members of the local church "in full connection" must be obtained and such consent must be expressed in a vote at a meeting called for the purpose, of which notice is given;

3. The consent, once obtained, must be confirmed at the Quarterly Conference before any property may be transferred or mortgaged; and

4. Prior to any transfer or mortgage of the church's property, the written consent of the Bishop of the Episcopal District must be obtained.

### C. Background on Powell's Fraud Scheme

Staccato Powell became Bishop of the AME Zion Church in 2016. His assignment was the Western Episcopal District. In October 2016, Powell formed the Western Episcopal District, Inc., a separate corporate entity that remained under his control for the next four years. Sheila Quintana was the CFO from 2017-2019, Rev. Jawwad Love was secretary from 2017-2019, and Dr. Sandra Davis was the agent for service of process and an officer. This separate corporate entity did not exist before Powell became bishop, and it remained under his control at all times during the fraud scheme. Powell's Western Episcopal District, Inc., will be described as his "separate corporate entity" throughout this memorandum.

During the 2016-2020 period, Powell committed the criminal offense conduct that resulted in his guilty plea in this case. In summary, by 2017, Powell used lies and deception to exert control over the title to assets of churches within the Western Episcopal District, through transfers of title from the congregations to his separate corporate entity. To do this, Powell instructed Quintana, Love, Davis and others to carry out the necessary steps to transfer title in the local churches' properties to his separate corporate entity and, with the title in hand, then execute loans through which his separate corporate entity received borrowed funds. The local churches' properties were put up as collateral. Powell knew that the lenders would require confirmation that the local congregations authorized these loans, and he knew the Denomination's rules about such transfers. During the July 2016 General Conference, then Bishop Powell served as the chairman for the commission on discipline codification, revising and presenting the 2016 edition of the *Book of Discipline*.

To complete the scheme, Powell directed Quintana, Love, Davis and others to concoct false paperwork such as resolutions purportedly documenting local church approval of the loans. These resolutions described votes of approval at congregational meetings verified by local church officials, but in reality, neither the meetings nor the votes took place and the reference to a local church official was

also false. The transactions continued until 2020. The parties' plea agreement includes a full recitation of the fraud scheme, which is summarized below.

### 1. Kyles Temple of Vallejo, California

First, Powell directed a committee of employees loyal to him, including Sheila Quintana, to prepare a false declaration purportedly signed by Davis as secretary of Kyles Temple in Vallejo, California. The resolution falsely asserted that a meeting occurred at which the Kyles Temple congregation, acting through its trustees, approved the title transfer. Davis, ostensibly the signatory to the resolution, was neither the secretary of Kyles Temple nor associated with the congregation in any way. In fact, there was no meeting at Kyles Temple about this resolution.

Powell, acting through his separate corporate entity, encumbered the Kyles Temple with a $500,000 mortgage in March 2017. The Kyles Temple congregation and pastor learned of the loan in May 2017. Kyles Temple's congregation challenged the transfer in a complaint to the Denomination. The Judicial Council of the AME Zion Church reviewed the complaint and found that the encumbrance placed on the Kyles Temple title was contrary to church law. Even though he directed others to prepare the false church resolution and he intended for the false information to assist his effort in obtaining the loan, Powell did not accept the Judicial Council ruling as binding.

### 2. First AME Zion Church of San Jose, California

By October 2017, Powell determined that he would use the First AME Zion Church of San Jose as collateral for a loan to purchase a new residential property in Morgan Hill, California, ostensibly to be used as the church parsonage. Powell was aware of meetings of the church's trustees on September 24 and October 1, 2017 in which the trustees voted against the transfer of the deed to Powell's separate corporate entity. Powell learned of these events because the trustees communicated their position to Rev. Brown, who Powell had installed recently in the San Jose church. Despite these entirely appropriate efforts by the trustees to fulfill their role with respect to transfer of any title, Powell directed Quintana and others to prepare a false resolution that purported to confirm approval of the loan by the San Jose congregation. When he learned during a title search that a Los Angeles-based AME Zion Church appeared to have a title interest in the San Jose church, Powell directed Quintana and others to prepare a second false church resolution, this one purportedly by the Los Angeles church. Using these

false documents, Powell obtained the loan using the San Jose church as collateral, instructing Quintana and others to borrow the funds without disclosing it to the trustees or the church's members. After receiving notification in late 2017 from attorneys for the San Jose church describing the 2017 transaction as fraud, Powell directed Davis and others to encumber the San Jose church with an additional loan in December 2019. The congregation of the San Jose AME Zion Church did not authorize the 2019 loan, either. Powell knew that the church resolutions prepared by Quintana and others at his direction were false, and he knew that the false information in the resolutions would enable the loans to move forward to successful conclusion, and he intended that the use of the false information in the resolutions would result in the loans' approval and funding.

### 3. Greater Cooper AME Zion Church of Oakland, California

In May 2019 and again in December 2019, Powell obtained loans for his separate corporate entity using the property of the Greater Cooper AME Zion Church without the congregation's knowledge or consent. From 2017-2019, the Reverend Jawwad Love was pastor of Greater Cooper. Powell appointed him, having known Rev. Love from a previous pastorate in South Carolina. During these same years, Powell appointed Love as secretary of his separate corporate entity. Here again, Powell obtained a false resolution in aid of his scheme, this one signed by Love and purporting to transfer title of the church's properties to Powell's separate corporate entity. Love also signed a grant deed transferring all interest in the church's properties' title to the corporation Powell controlled. The two loans in 2019 encumbered this church to an approximate total amount of $1.5 million. The congregation did not know of or authorize the loans. There was no membership meeting to inform the members or take their vote. The trustee board did not learn about the loans. Powell knew of this – he knew that Love took his actions in connection with the loan without the knowledge or approval of the congregation, and he knew that Love falsely asserted he was a trustee of the congregation. Powell intended for Love's actions to result in the loans.

### 4. University AME Zion Church of Palo Alto, California

In summary, in March 2018, Powell directed Quintana and others to execute a loan using the property of this church as collateral. Additional loans followed. The total amount of the encumbrances placed by Powell on this church was approximately $3.9 million. Powell never disclosed the existence

of the loans to the pastor of the church, even though he had regular contact with the pastor on church matters. Nor did Powell inform the church's trustee board about the loans. Powell knew that his separate corporate entity encumbered the University AME Zion Church, and he concealed the loan from the pastor, the trustees, and the congregation of University AME Zion Church.

### 5. First AME Zion Church of Los Angeles, California

By December 2017, Powell determined that this AME Zion Church would provide the collateral for additional loans to his separate corporate entity. At Powell's direction, two additional false church resolutions were prepared and submitted to the lender for approval of the requested loan. The resolutions were false in various assertions. The resolutions falsely stated that the congregation met and voted to approve the transfer of title. In truth, there was no meeting, nor was there a vote taken. The resolutions bore the apparent signature of the secretary of the Los Angeles church. But that was also false. The secretary did not sign either of the two resolutions. Instead, at Powell's direction, Quintana forged the signature of the church secretary.

### 6. Other Loans

Powell continued to execute the fraud scheme until 2020, with additional, significant loans using the property of the following churches as collateral without their knowledge or authorization: Fisher Chapel AME Zion Church in Phoenix, Arizona; Stewart Chapel AME Zion Church in Redwood City, California; Stewart Tabernacle AME Zion Church in Fresno, California; and Shiloh AME Zion Church of Monrovia, California. Powell knew that the congregations did not authorize these loans. He concealed the existence of the loans from the congregations, knowing that the concealment was material to the scheme. Powell intended to borrow these funds without disclosing the loans to the churches.

### D. Bankruptcy Proceedings

On July 30, 2020, the entity WED, Inc. filed for Chapter 11 protection in the US Bankruptcy Court for the Eastern District of California. In a Schedule of Assets filed by the debtor, WED, Inc. claimed to own 11 churches, a parsonage, and Powell's official residence. WED, Inc.'s bankruptcy filings listed assets with a value of $26,338,031 and debts on those assets in the amount of $12,475,453. The overwhelming majority of these liabilities were high-interest loans provided by private investors. The church properties listed by WED, Inc. in the bankruptcy proceeding as its real property are shown in

the table below. *See In Re AME Zion Western Episcopal District*, E.D. Cal. Bk. Case 20-23726, Dkt. no. 31.

| Property | Property Description | Fair Market Value |
|---|---|---|
| Fisher Chapel AME Zion, Phoenix, Arizona | 1.13 acres; 49,163 sq. ft. | $840,000 |
| Greater Cooper AME Zion, Oakland, California | 3 separate parcels 0.22 acres; 9,525 sq. ft. | $2,172,282 |
| First AME Zion, San Jose, California | None provided | $2,380,000 |
| University AME Zion, Palo Alto, California | 0.97 acres; 42,282 sq. ft. | $7,200,000 |
| Stewart Chapel AME Zion, Redwood City, California | 0.11 acres; 5,000 sq. ft. | $1,370,000 |
| Kyles Temple AME Zion, Sacramento, California | 1.3 acres; 56,628 sq. ft. | $2,374,500 |
| Hillard Chapel AME Zion, Stockton, California | 0.43 acres; 18,750 sq. ft. | $1,000,000 |
| Stewart Tabernacle AME Zion, Fresno, California | None provided | $690,000 |
| First AME Zion, Los Angeles, California | 0.77 acres; 33,634 sq. ft. | $2,400,000 |
| Shiloh AME Zion, Monrovia, California | 0.11 acres; 4,780 sq. ft. | $748,400 |
| Episcopal Residence, Granite Bay, California | 0.09 acres; 3,704 sq. ft. | $1,489,000 |
| Parsonage, Morgan Hill, California | 0.06 acres; 2,750 sq. ft. | $1,600,000 |
| Miracle Mountain AME Zion, Denver, Colorado | None provided | $2,073,849 |

### E. Forensic Financial Analysis

The FBI conducted an analysis of relevant bank and transaction records. The analysis documented mortgages by WED, Inc. on at least 19 church properties, using those properties as collateral to receive cash proceeds of approximately $8.5 million. Of this total, $2.3 million went into escrow to fund purchases of other properties and $2.2 million was used to pay service on the indebtedness. Of the remainder, the largest components of payments were $589,000 in transfers to various individuals, $417,000 in travel and entertainment, $375,000 in events and catering, $284,000 in transfers to Powell's personal account, $253,000 in expenses related to Powell's episcopal residence, $62,000 in payments to medical service providers, $52,000 in cash withdrawals, and $20,000 in

payments to professional basketball teams in Sacramento and Charlotte. The total amount of the outflows from WED, Inc. listed in the FBI report is $8,889,047. During the time of the fraud scheme, Powell received approximately $190,000 into his personal accounts, including the following amounts in the following categories on an annual basis: (1) $95,436 in salary as a bishop; (2) $53,122 from WED Inc.; (3) $14,704 from other AME Zion churches; (4) $12,418 in payments from individuals; (5) $11,250 from the California Conference; and (6) $3,208 in cash.

## IV.   SENTENCING RECOMMENDATION

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The sentencing process begins with the Court's calculation of the correct sentencing range under the Guidelines. *Id*. After determining the appropriate guidelines, the Court then turns to the evaluation of the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others: 1) the nature and circumstances of the offense and the history and characteristics of the defendant; 2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; 4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and 5) the need to provide restitution to any victims of the offense.

### 1.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

As noted above, Powell's conduct represents an abuse of authority and breach of trust by a religious leader, with significant consequences for the adherents who followed him. This scheme involved lies and deception – by Powell and by others acting at his direction. Powell admitted his conduct in the lengthy plea agreement.

Powell is 65 years old and has no previous criminal record. In the past forty plus years, Powell has been a minister, leading churches in North Carolina and Missouri. The denomination stripped

Powell of the bishop title. Powell continues to be a minister, holding prayer meetings online and attending services for those who continue to look to him as a religious leader. Powell is a care provider for his extended family in North Carolina, where he resides.

### 2. The Need for the Sentence to Address the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Promote Deterrence, and Avoid Unwarranted Disparities

The parties' agreed disposition advances the timeline for resolution in this case as well as the bankruptcy proceedings. With this defendants' plea, both defendants are guilty of conspiracy to commit fraud in connection with the transfer of titles of church properties to Powell's separate corporate entity. The advanced timeline not only settles and resolves the question of Powell's guilt, but it provides a clear factual basis for the bankruptcy court to conclude that the underlying transactions were fraudulent transfers of title. For the government in this case, the disposition balances the important interests in the defendant's sentence in a way that values the most important interest – returning ownership and control of the congregations' properties to the congregations, who were stripped of their input, control and consent to the transactions.

The agreed sentence also brings finality. The offense conduct began nine years ago in 2016. Mr. Powell's fraud took place during 2016-2020, and the Grand Jury returned the Indictment over three years ago in January 2022. If the Court imposes the agreed sentence, the criminal proceedings end. There will be the opportunity for closure for those who suffered under Mr. Powell's tenure in the Western District, those who stood up to him and his conduct, and for the many others he betrayed and misled.

The agreed sentence holds the defendant accountable. In the plea agreement, defendant gave a full set of admissions in a lengthy factual basis. He is accountable for each fact in the agreement. If this matter were to go to trial in the absence of a plea, Mr. Powell would enjoy the privilege against self-incrimination and therefore would not be required to testify. Even if he took the stand, the full set of admissions in the plea agreement may not have been adduced for a number of reasons. Having the full truth of his factual admissions in the public record holds value for the community – both the individual churches and the Denomination.

The agreed sentence eliminates uncertainty. A trial is not completely free of risk. To try a case

of this scope will necessarily involve not only a significant investment of time but the proceedings carry a degree of risk for all involved. A trial requires time for preparation and execution, with the process that is not always predictable as to timeline or scope. At the end of trial, the dispute may move to the appellate court. For each step in the process, the facts are contested, and the parties await resolution. Elimination of trial and appellate proceedings has real value here, especially in light of the plea agreement admissions.

The agreed sentence punishes the defendant. Adjudged a felon, this former bishop will complete the 18-month sentence on home confinement, a term that restricts his liberty and completes his transformation from someone who projected power and abused trust to a convicted felon who has been sentenced. Moreover, according to his statement accepting responsibility, this defendant will have to answer to his faith, his followers, and the higher power he has spent his career telling others to serve. The judgment of this Court completes and reinforces the weight of this judgment.

### 3.     The Need to Provide Restitution to Victims

Under the Mandatory Victim Restitution Act (MVRA), restitution is required for "an offense described in subsection (c)," which includes "an offense against property under this title, ... including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). In this case, the term "victim" means any person "directly and proximately harmed" by the offense conduct and because the offense conduct involves a "scheme, conspiracy, or pattern of criminal activity" it also means any person "directly harmed" by the defendant's conduct "in the course of the scheme, conspiracy or pattern." 18 U.S.C. § 3663A(a)(2). The Ninth Circuit has recognized the mandatory nature and scope of restitution in cases involving a fraud scheme utilizing wire fraud and mail fraud. *See United States v. Thomsen*, 830 F.3d 1049, 1065-1066 (9th Cir. 2016) (mail fraud); *United States v. Johnson*, 854 F.3d 1098, 1102 (9th Cir. 2017) (wire fraud). Therefore, in this case, the restitution is not limited to the counts of conviction but extends to all the harm caused by the scheme, including through any uncharged conduct. *Thomsen*, 830 F.3d at 1066.

The victim's harm must be related to the scheme. *See also United States v. Gamma Tech Indus.*, 265 F.3d 917, 928 (9th Cir. 2001) ("the loss cannot be too far removed from" the "conduct underlying the offense of conviction"). Defendant's economic circumstances are irrelevant. *United States v. De La*

*Fuente*, 353 F.3d 766, 769 (9th Cir. 2003) ("If the MVRA applies, a restitution order is mandatory regardless of the defendant's ability to pay."). The Court can order restitution to which the parties have agreed in a plea agreement and can include payment obligations within the conditions for supervised release imposed. 18 U.S.C. § 3663(a)(3) (court's authority to order agreed-upon restitution); 18 U.S.C. § 3583(d) (court's authority to impose restitution conditions on supervised release). The United States bears the burden to establish the restitution claim by a preponderance of the evidence. 18 U.S.C. § 3664(e).

Applying these principles, the United States seeks a restitution order in the amount of $12,475,453. This is the amount of debt Powell placed on the AME Zion Church in the Western Episcopal District, according to public filings Powell made in bankruptcy court. On July 30, 2020, Powell's separate corporate entity under his control filed for Chapter 11 bankruptcy protection in the Eastern District of California. Within the filing, the entity listed eleven churches and two residences in its schedule of assets. Under Powell's scheme, the corporate entity encumbered each of the churches and residences with massive debt. At all times, Powell was the chief executive officer in firm and full control of this corporate entity. The statements in the entity's bankruptcy filing more than carry the government's burden to establish the loss by a preponderance of the evidence. The government will be prepared to discuss payment conditions it believes will serve the interests of sentencing at the hearing.

## V.  POWELL'S DISCLOSURE OF ASSETS

On July 17, 2025, following the change of plea hearing, government counsel sent defense counsel a financial disclosure statement for Powell to complete, with a requested completion date of August 18, 2025. Government counsel also flagged a set of wire transfers in amounts ranging from $16,250-$71,000 with a request for additional information from Powell explaining the transfers.

On August 19, 2025, defense counsel provided the completed financial disclosure statement with attachments to government counsel and Probation. The attachments included bank account records, a tax return, and other materials documenting Powell's transfer of ownership in a vehicle, auto insurance, and a lease renewal.

On August 22, 2025, government counsel provided copies of filings with the North Carolina state government relating to an entity called New Church Believers LLC, which Powell formed on

1  October 15, 2021.  According to the filings by Powell as CEO, the business of New Church Believers
2  LLC is religious and missions focus.  Powell's August 19 disclosures included copies of statements for a
3  Wells Fargo Bank account in the name of New Church Believers for August 2024-2025.  An analysis of
4  the bank records confirmed that over the past year, Powell received an average of $8,000 per month
5  from transfers to him via New Church Believers.
6     Following additional meet and confer between counsel, the government requested that Powell
7  attend an examination under oath before the sentencing hearing, which has been set for September 22,
8  2025.

## VI.  CONCLUSION

The United States respectfully requests that the Court impose the sentence described in the plea agreement.

DATED:                                          Respectfully submitted,

                                                CRAIG H. MISSAKIAN
                                                United States Attorney

                                                /s/ Jonathan U. Lee
                                                JONATHAN U. LEE
                                                Assistant United States Attorney